IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OWL INTERNATIONAL, INC.**<br>4701 S. 16th Street<br>Philadelphia, PA 19106<br>Plaintiff,<br>v.<br>**TRAVIS DARDEN**<br>2618 Federal Street, Unit 1,<br>Philadelphia, PA 19146<br>Defendant. | Docket No.: |

**VERIFIED COMPLAINT**

Plaintiff Owl International, Inc. d/b/a Global, a 1st Flagship Company ("Global" or "Owl International"), by and through its undersigned counsel, files this Complaint against its former Vice President, Strategic Naval Operations, Defendant Travis Darden ("Darden"), and, in support thereof, avers as follows:

**NATURE OF THE ACTION**

1. Global is a specialized, privately owned government contractor that provides naval maintenance, repair, logistics, salvage, towing, emergency-response, and related technical services to the United States Navy and other Department of Defense entities.

2. Darden worked for Global from September 18, 2023, through May 7, 2026. Darden's last position was Vice President, Strategic Naval Operations, one of Global's four most senior leadership positions. Darden reported directly to Global's President and Chief Executive Officer.

3. Based on forensic examination, while Darden was under investigation for possible workplace-related misconduct, he exported to an external storage device the inbox, outbox and

backup PST folders from the Microsoft OneDrive on his Company-issued laptop computer. Darden also exported approximately 487 unique documents in Excel, Word, PDF and PowerPoint format to the storage device.

4. The data Darden exfiltrated includes documents marked or otherwise constituting Controlled Unclassified Information ("CUI") that Global received or generated in the course of providing services to the Department of the Navy. The dissemination of this information violates the limitations the federal government imposes on the release of this information as established under Executive Order.

5. After he was terminated, Darden failed to return the exported data or to advise Global that he had exfiltrated this information.

6. Global brings this action seeking to recover this data, to determine the extent to which it has been further disseminated and to obtain any other equitable relief warranted under the circumstances. Global also seeks compensation for expenses and other losses resulting from Darden's wrongful conduct, punitive damages, attorneys' fees, interest and costs.

## PARTIES

7. Global is a corporation organized and existing under the laws of California with its principal place of business at 2465 Campus Drive, Irvine, California 92612. Global also maintains an office in this District and conducts its business in interstate commerce.

8. Darden is a citizen of the Commonwealth of Pennsylvania and resides in Philadelphia.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 18 U.S.C. § 1836(b) and 28 U.S.C. § 1367 because Global asserts claims under the laws of the

United States, including the Defend Trade Secrets Act of 2016, and the state law claims asserted herein are so related to Global's federal claim that they form part of the same case or controversy.

10. The Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims occurred and the property at issue is located in this District.

12. This Court has personal jurisdiction over Darden because he resides and worked in Pennsylvania and because a substantial part of the conduct giving rise to these claims occurred in Pennsylvania.

## FACTUAL BACKGROUND

### I. Global's Business and the Importance of its Confidential Information and Trade Secrets

13. Global is a specialized, privately owned government contractor that provides naval maintenance, repair, logistics, salvage, towing, underwater ship repair, emergency response, and related technical services to the United States Navy and other Department of Defense entities. For instance, under separate contracts, Global removes equipment and components from decommissioned naval ships for use as replacement parts for vessels currently in the fleet. Global also maintains prepositioned warehouses around the CONUS and OCONUS in Alaska, Hawaii, California, Virginia, Singapore, Italy, Spain, and Bahrain, so the company can quickly deploy the necessary resources in the event of an oil spill, aircraft recovery operations, security protection involving Navy vessels, and other emergent requirements.

14. As Global's customers are government entities, the contracts it obtains with those customers are secured through competitive (usually sealed) bidding.

15. Global competes for a limited number of government contracts and task orders under rigorous procurement requirements. Awards and recompetes turn on pricing, staffing, operational capabilities, past performance, and customer-specific knowledge.

16. Global develops yearly strategic plans that set forth the Company's objectives, operating assumptions, budgets, initiatives, milestones, risks, and assigned responsibilities. It has developed proprietary bidding strategies and cost models that inform the pricing, technical approach, and proposed terms of its bids. Global restricted access to proposal files containing its proprietary bidding strategies and cost models to designated executive team members and consultants assigned to proposal efforts. Global maintained those files in SharePoint folders with permissions limited to those authorized personnel, rather than making them available to employees generally.

17. Global has furthermore developed and continually refines proprietary methodologies for performing the services it delivers to the Navy and other customers based on the experiences and challenges encountered in ongoing projects. These methodologies are highly effective and give Global a competitive edge.

18. Global has invested substantial time, money, and personnel in developing and maintaining this information.

19. This information derives independent economic value from not being generally known to, or readily ascertainable through proper means by, Global's competitors. Access would enable a competitor to anticipate Global's bidding and performance strategies, underbid its proposals, target key personnel for recruitment, or replicate its proprietary methodologies without incurring the cost and time required for independent development.

20. Access to these materials would enable a competitor to incorporate Global's established methods into its technical or management proposal for the Inactive Ships contract recompete without incurring the time and expense of independently developing comparable procedures. Global restricts internal access through SharePoint permissions and provides the procedures to designated Government personnel to satisfy contractual deliverable requirements.

21. Unauthorized use or disclosure would diminish the information's value, impair Global's competitive position, and confer an improper advantage on a person who did not independently develop it.

22. Further, on many of its Navy projects, Global is provided with technical data on ships and onboard systems, equipment and parts with which it works. These disclosures include data marked CUI or otherwise constituting CUI.

23. CUI is unclassified information created or possessed by the United States Government, or by an entity for or on its behalf, that applicable law, regulation, or Government-wide policy requires or permits an agency to protect through safeguarding or dissemination controls. *See* 32 C.F.R. § 2002.4(h)(2026). Executive Order 13556 established a uniform program within the Executive Branch for managing CUI. *See* Exec. Order No. 13556, 75 Fed. Reg. 68675 (Nov. 4, 2010).

24. Unauthorized use or disclosure of CUI is inimical to the public interest and threatens public safety.

## II. <u>Global's Efforts to Secure the Confidentiality of its Protected Information</u>

25. Global utilizes commercially reasonable measures to protect the secrecy of its proprietary processes, methodology data, and other business information.

26. Global's operations are often at Government-Owned, Contractor-Operated ("GOCO") sites that are closed to the public and patrolled by security guards responsible for restricting entry to authorized personnel.

27. Global generally maintains its business information on computer systems. Access to this information is shielded by internal controls requiring authorized users to authenticate with assigned usernames and associated passwords. Global further maintained sensitive confidential information on SharePoint files and folders. Access to SharePoint files and folders is limited to select personnel with a need to know.

28. Global also utilizes non-disclosure agreements and company policies to ensure that its employees appropriately use, safeguard, and return all confidential and trade secret information to Global upon the termination of their employment.

## III. Darden Joins Global and Is Provided Access to Trade Secret and CUI Data After Agreeing to Protect the Confidentiality of this Information

29. Global hired Darden on September 18, 2023 as the Site Manager for its operations in Philadelphia on Contract No. N00024-22-C-4203 covering the inactive ship services on vessels docked at the Philadelphia Navy Yard.

30. On the day he was hired, Darden executed a "Confidential/Proprietary Information Agreement & Inventions Agreement" (the "Confidentiality Agreement"). (A copy of the Confidentiality Agreement is attached hereto, made a part hereof and marked Exhibit A.)

31. Darden worked at a GOCO site in Philadelphia. In addition to security controlling access, designated areas of the facility are controlled by keycard access that serves to limit physical access to locations where Global's protected information is maintained or used.

32. Darden was subsequently promoted to Vice President, Strategic Naval Operations. In this position, he was responsible for driving Global's business development, organic contract

growth, and long-term strategy to expand the company's presence in ship repair, maintenance, and labor support and strengthening the company's competitive position in the defense sector. His duties included leading business development to identify, pursue, and win new Navy contracts, expanding the company's portfolio, and developing strategies to drive organic growth of existing contracts, including increased scope, option-year extensions, and follow-on opportunities.

33. Darden played a principal role in evaluating contracting requirements, costing, bid preparation, contingency planning, revisions of policies and procedures for carrying out contract functions, revising training procedures and requirements, contributing to Global's Strategic Operating Plan, and refining Global's business plan.

34. In addition, Darden retained indirect supervisory responsibility for Global's performance under Contract No. N00024-22-C-4203.

35. Given his senior management responsibilities, Darden was afforded wide access to Global's data, including its most competitively sensitive business information. He also had access to Navy CUI.

36. Darden received a "secret" security clearance from the federal government. Darden also attended cybersecurity training required by the federal government to maintain this clearance.

37. Upon information and belief, Darden executed a "Classified Information Nondisclosure Agreement," also known as "Standard Form 312," with the federal government in connection with his position at Global. This agreement requires him to protect, in perpetuity, sensitive federal government information accessed in connection with his position, including CUI.

## IV. Darden Surreptitiously Copied Virtually All of the Contents of His Desktop To A Personal Storage Device

38. On or about March 12, 2026, Darden was interviewed as part of an internal company investigation.

39. The next day – March 13, 2026 – Darden caused a Memorex data storage device, serial number 900052662C513432, to be connected to the laptop. The Memorex device was assigned "drive D" on the laptop. 487 unique user documents and 53 folders were created on the D-drive.

40. There was also Outlook application interaction with the USB on March 16.

41. On March 17, the "tdarden" account successfully unlocked the laptop, after which Excel interacted with the volume, and D-drive workbook and Office-cache artifacts were recorded.

42. On or about March 19, 2026, Darden reported that the laptop had been subject to a phishing attack that rendered it inoperable and inaccessible.

43. In fact, and unbeknownst to Global at that time, no malware or viruses were installed on the laptop during the phishing episode. After the phishing attack, upon information and belief, the laptop was accessed using Darden's login and password on March 24, during which time files were opened and applications ran without issue.

44. On April 1, 2026, Global's CEO and President sent Darden a text message directing him to bring the laptop to Global's Philadelphia office for a cybersecurity review. Darden promised to do so. A true and correct copy of this text exchange is set forth below:



45. On Thursday, April 2, 2026, the day on which he was to return the laptop, an external investigator informed Darden that she was investigating a complaint against him.

46. After this conversation, Darden failed to return the laptop as he had been instructed.

47. Instead, the next day, April 3, 2026, Darden accessed the laptop and, based on a forensic review of the laptop, deleted the Outlook email backup folder.

## V. <u>Global Terminated Darden And Discovers His Mass Misappropriation of Data</u>

48. Global terminated Darden's employment on May 7, 2026.

49. Throughout May and June, in letters exchanged between counsel for the parties, Global's counsel repeatedly demanded the laptop's return. He even offered that the Company would pay the costs of shipping it to Global's Irvine, California offices.

50. Darden finally made the laptop available to Cornerstone Discovery, a computer forensics firm Global engaged, for pickup on July 14, 2026.

51. At Global's request, Cornerstone Discovery then conducted a digital forensic examination.

52. During its examination, Cornerstone discovered that Darden transferred, in bulk, the corporate OneDrive Desktop and Outlook data stores to the Memorex device, effectively creating a mirror image of his Global desktop. Computer artifacts indicate that over 4 GB of data was transferred.

53. The transfer of OneDrive Desktop and Outlook data stores to the Memorex device effectively removed them from the laptop. Darden failed to or was unable to delete the Offline Storage Table on the laptop. Working with Cornerstone, Global has engaged in an extensive effort to identify as many of the Outlook documents Darden exfiltrated as possible.

54. Darden also exported 487 unique files in Microsoft Excel, PowerPoint, Word and PDF format. A list of the documents that were exfiltrated is attached hereto, made a part hereof and marked Exhibit B.

55. The exfiltrated data identified to date encompasses every aspect of Global's business. While also including ordinary-course communications, the files and other data encompass volumes of nonpublic standard operating procedures documenting Global's methods for vessel movement, crane operations, equipment removal, severe flooding response, Government-furnished equipment control, and facility and vessel security. These procedures incorporate Global-developed task sequences, coordination methods, and operational decision criteria. Darden also transferred budget projections, salary data, inventories, training and muster data, production support charts, status reports, discrepancy reports, tracker data, and planning documents. The exfiltrated documents furthermore include security plans whose compromise threatens personnel and Navy vessel safety.

56. A description of exfiltrated documents in PowerPoint, Word and PDF format is attached hereto and marked Exhibit C. The PowerPoint, Word and PDF format exfiltrated documents include:

a. **2025 Operations Accomplishments.pptx**. This PowerPoint presentation reviewed Global's operational accomplishments, including suggested process refinements drawn from issues Global confronted in performance.

b. **300-002-22 FACILITY AND VESSEL SECURITY.docx**

(i) This Word document, first created on June 26, 2024 and periodically updated, establishes Global's nonpublic standard operating procedures documenting its methods for facility and vessel security.

(ii) These procedures incorporate Global-developed task sequences, coordination methods, and operational decision criteria.

c. **BD Ship Repair Strategy1.docx**

(i) This Word document, first created on January 6, 2025, details Global's nonpublic Business Development Ship Repair Strategy documenting its plan to strengthen its position in the ship repair and maintenance industry. The document: (1) includes detailed investment breakdown and financial projections; (2) sets strategic goals for developing technical performance capabilities and building relationships with key stakeholders; (3) identifies untapped business opportunities; and (4) outlines Global's investment priorities, financial assumptions, and coordinated approach to market development.

(ii) This information has competitive value because it reveals how Global intends to allocate resources and pursue growth.

d. **18 Week Metrics.pptx**

(i) This PowerPoint presentation consolidates Global's internal operational strategies, performance metrics, safety and quality information, and contract execution activities.

(ii) The presentation contains nonpublic information concerning Global's strategies to stabilize and strengthen operations and align performance with the Chief of Naval Operations' "Get Real, Get Better" initiative.

(iii) The presentation also includes an asset management and protection Gantt chart covering April 22 through August 26, 2024, identifying ship availabilities executed by Global, vessel names, technical tasks completed, and weekly visitor escort totals from April 29 through August 26, 2024.

(iv) Access to the presentation was limited to Global's executive team and site manager, with designated safety, quality assurance, and other assigned personnel having access to relevant portions of the supporting information. Unauthorized disclosure could enable a competitor to identify operational challenges, anticipate Global's improvement priorities, adapt its own management approach, or exploit the information in competing proposals. Disclosure could also expose nonpublic Navy vessel schedules and site activities, creating potential operational security concerns;

e. **400-001-24 MOVEMENT OF VESSELS.doc**

(i) This Word document, first created on July 31, 2024, contains nonpublic standard operating procedures developed by Global for receiving, releasing, or moving ships and craft at the NAVSEA Inactive Ships On-Site Maintenance Office in Philadelphia, Pennsylvania.

(ii) Unauthorized access to or disclosure of this proprietary information could reveal vessel status, movement procedures, readiness, deficiencies, and Government operations, creating security risks and

exposing Global's internal operating methods to exploitation by competitors or other third parties.

(iii) Contract No. N00024-22-C-4203 has a current value of approximately $73 million and is scheduled to expire on June 30, 2027. Global anticipates competition for the follow-on requirement. Access to these nonpublic procedures could provide a competitor an advantage by enabling it to incorporate Global's established methodologies into its technical or management proposal without incurring the time and expense of independent development.

f. **Business Case Fee INACSHIPS.docx**

(i) This Word document, first created on December 30, 2025, contains nonpublic business case information developed by Global to support its proposed application of fee to subcontractor labor and other direct costs under its Inactive Ship maintenance and management program.

(ii) The document explains how Global's contractor-led execution, system integration, and continuity of operations provide Government benefits through risk reduction and cost avoidance.

(iii) The document also details Global's acquisition and use of a company-specific system to enhance asset accountability and material tracking, including estimated Government cost avoidance associated with audit and inventory activities, material reutilization, and transition risk.

(iv) The document contains Global's internal business rationale, operational approach, and cost-avoidance estimates. It was not distributed to the workforce generally; disclosure was limited to executive leadership, the Global site manager, and designated Government personnel.

57. The exfiltrated Excel documents include the following:

**a. Copy of Global_SEA21 Technical Input Cap-Exp(revised).xlsx**

(i) This Excel sheet, first created on March 16, 2025, contains proposal preparation information for the recompete of its Inactive Ships contracts. Global populated the spreadsheet with its internal assessment aligning anticipated contract tasks with its capabilities, past performance, and experience, including personnel qualifications and proposed roles, available resources, and capacity to address complex requirements and changing demands.

(ii) Although containing nonpublic information, Global's selection, organization, and application of that information reveal its planned approach to anticipated contract requirements. Unauthorized disclosure could enable a competitor to anticipate Global's technical and management approach or adapt its own proposal strategy without incurring comparable research and planning costs, diminishing Global's competitive advantage in the Inactive Ships recompetes.

**b. Supply Weekly PO Plan7.8.24.xlsx**

(i) This Excel file, first created on September 18, 2024, contains a nonpublic compilation of more than fifty vendors contracted to support Global's Philadelphia Inactive Ships Contract.

(ii) The file identifies each vendor's Costpoint vendor ID, purchase order date, name, assigned tasks for the weekly work plan dated June 24, 2024, and remaining purchase order balance. Internal access was limited to Global's supply chain personnel, executive leadership, site manager, and financial team; the spreadsheet was not accessible to employees generally. Global also provides it to designated Government personnel as a required deliverable under paragraph C.3.5.3.4 of the contract.

(iii) The compilation reveals Global's vendor relationships, allocation of subcontracted work, planned execution activities, and remaining purchase order balances.

(iv) Unauthorized disclosure could enable a competitor to identify and approach Global's vendors, replicate its subcontracting approach, or use its task allocation and purchasing information to inform a competing technical, management, or pricing proposal. Such use could reduce a competitor's sourcing and planning costs, disrupt Global's vendor relationships, and undermine its competitive position in the anticipated follow-on procurement; and

c. **Budget Projection PHILLY.xlsx**

(i) This Excel document, first created on February 11, 2025, is a nonpublic budget projection spreadsheet developed and maintained by Global for its Philadelphia Inactive Ships Contract.

(ii) The spreadsheet details employee hours by pay period, current and maximum hourly burn rates, projected costs per pay period at each rate, cumulative hours and costs, personnel counts, calculation formulas and assumptions, and the remaining budget. Internal access is restricted to Global's executive team, site manager, and finance department. Selected information is provided to designated Government personnel to satisfy cost-reporting requirements.

(iii) The spreadsheet reveals Global's internal staffing projections, expenditure forecasts, budget management methods, and financial assumptions.

(iv) Unauthorized disclosure could enable a competitor to analyze Global's anticipated resource requirements and cost structure, assess its budget constraints, or use its calculations to inform competing staffing and pricing strategies without incurring comparable analytical costs.

(v) Use of the document in this manner is likely to undermine Global's competitive position in the anticipated follow-on procurement.

58. Given Darden's position, the exfiltrated data contains a broad spectrum of communications, planning and information about Contract No. N00024-22-C-4203 for the work on inactive ships in Philadelphia.

59. The exfiltrated data also includes documents marked CUI or otherwise containing CUI. Notably, Darden exfiltrated Site Maps of the locations of U.S. Navy vessels, their assigned piers, and associated barges, at the Inactive Ships site on the active naval base in Bremerton, Washington. Each map includes a ship-category legend and bears Government CUI and Distribution Statement C markings. These documents contain controlled operational information concerning Navy vessel locations and site arrangements. Unauthorized disclosure could expose those arrangements to persons outside the authorized recipient group, create security risks, and compromise the Government's restrictions on dissemination.

60. The documents at issue were generally stored on Global's SharePoint system.

61. The Site Maps were entrusted to Global in connection with contract performance. The distribution statements on these documents limit distribution to U.S. Government agencies and their contractors for administrative or operational use and direct other requests to the Director, NAVSEA 21I.

62. Global reported the misappropriation of this data to the Navy.

63. Upon information and belief, Darden continues to possess or control the Memorex device, or one or more copies of the information transferred to it, and therefore continues to possess Global's confidential information and trade secrets, as well as sensitive CUI from Global's federal government contracts.

## COUNT I—BREACH OF CONTRACT

64. Global incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

65. The Confidentiality Agreement is a valid and enforceable contract supported by adequate and sufficient consideration.

66. The covenants in the Confidentiality Agreement are appropriate in scope and reasonably necessary to protect Global's legitimate interests.

67. Under the Confidentiality Agreement, Darden was prohibited from retaining or using Global's business information other than in the ordinary course of his employment and was required to return all of Global's property — including electronic files — upon the termination of his employment.

68. Specifically, the Confidentiality Agreement provided that:

> b) I understand that the Company possesses and will possess Proprietary Information that is important to its business. For purposes of this Agreement, "Proprietary Information" is information that was or will be developed, created or discovered by or on behalf of the Company, or that became or will become known by, or was or is conveyed to, the Company, that has commercial value in the Company's business. "Proprietary Information" includes, but is not limited to, trade secrets, computer programs, designs, technology, ideas, know-how, processes, formulas, compositions, data, techniques, improvements, inventions (whether patentable or not), works of authorship, business and product development plans, the salaries and terms of compensation of other employees, customers, pricing data and other information concerning the Company's actual or anticipated business, research or development, or that is received in confidence by or for the Company from any other person. I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information.
>
> c) I understand that the Company possesses or will possess "Company Materials" which are important to its business. For purposes of this Agreement, "Company Materials" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents have been prepared by me or by others. "Company

Materials" include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes, printouts, sound recordings and other printed, typewritten or handwritten documents, as well as samples, prototypes, models, products and the like.

d) In consideration of my employment by the Company and the compensation received by me from the Company from time to time, I hereby agree as follows:

(i) All Proprietary Information and all title patents, patent rights, copyrights, mask work rights, trade secret rights, and other intellectual property and rights, anywhere in the world that I develop or receive during the course of my employment by the Company (collectively, "Rights") shall be the sole property of the Company. I hereby assign to the Company any Rights I may have or acquire in such Proprietary Information. At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company. Nothing contained herein will prohibit an employee from disclosing to anyone the amount of his or her wages.

(ii) All Company Materials shall be the sole property of the Company. I agree that during my employment by the Company, I will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or during my employment if so requested by the Company, I will return all Company Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; and (ii) my copy of this Agreement.

69. Darden's exfiltration of data was fundamentally inconsistent with his commitment to use Global's Company Materials only during the course and scope of his employment and to return all of Global's business records and other data upon the termination of his employment. The removal of his inbox, outbox and backup folders also served to deprive Global of access to the information contained in those files.

70. As a direct and proximate result of these breaches, Global has suffered, and will continue to suffer, irreparable harm, including through the loss of control and confidentiality of its trade secrets and other confidential information, and has incurred external and/or internal costs to investigate Darden's actions and recover its data.

71. Darden's wrongful actions have also directly and proximately harmed Global's reputation and goodwill with the Navy and would facilitate the ability to compete against the Company using its own property, data, and information.

72. Contract No. N00024-22-C-4203 has a value of $73 million and expires on June 30, 2027. It will be rebid imminently, and the loss of this rebid would result in multimillion-dollar losses for Global.

## COUNT II—BREACH OF FIDUCIARY DUTY

73. Global incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

74. A relationship of trust and confidence existed between Global and Darden — a high-ranking executive officer and member of Global's senior leadership team who had access to Global's most valuable trade secrets and confidential information.

75. Darden thus owed and continues to owe fiduciary duties to Global, including the duty of loyalty.

76. Darden breached his duty of loyalty to Global by failing to act in good faith and in its interests by taking and retaining Global's trade secrets and other confidential and business information and deleting files.

77. Darden was aware of his duties concerning the protection of Global's trade secrets and other confidential information and, as a result, his breach of fiduciary duty was intentional, willful, and malicious.

78. As a direct and proximate result of these breaches, Global has suffered, and will continue to suffer, irreparable harm, including through the loss of control and confidentiality of its trade secrets and other confidential information.

79. Darden's wrongful actions have also directly and proximately harmed Global's reputation and goodwill with the Navy and may permit Darden to unfairly compete against the Company using its own property, data, and information.

## COUNT III—CONVERSION AND REPLEVIN

80. Global incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

81. Global holds title and the exclusive right to possession of all data, files and folders Darden exfiltrated to the Memorex Device.

82. The contents of the exfiltrated files, data and folders were not generally known to the general public and, to the best of Global's information and belief, were not known to third parties.

83. Darden has wrongfully deprived Global of its exclusive right to possession of the exfiltrated data, files and folders by deleting folders on his laptop and retaining a copy of this information.

84. Global is entitled to a writ of seizure to obtain the property that is the subject matter of this replevin action.

85. Darden's continued possession of data and information that properly belongs to Global will adversely affect Global and permit Darden to unfairly compete against Global using Global's own property, data, and information.

86. Darden's wrongful actions have also directly and proximately harmed Global's reputation and goodwill with the Navy and may permit Darden to unfairly compete against the Company using its own property, data, and information.

**COUNT IV—VIOLATION OF DEFEND TRADE SECRETS ACT**

87. Global incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

88. The data, files and folders Darden exfiltrated contain trade secret information that derives independent economic value from not being generally known or readily ascertainable through proper means by persons who could obtain economic value from its disclosure or use.

89. The amount of information exfiltrated standing alone would give a competitor a significant unfair advantage because it touches upon virtually every aspect of Global's business.

90. The documents relating to Global's processes disclose information about the time-proven methodologies that give Global a competitive edge and are grounded in Global's experiences in working with the Navy on prior projects.

91. The documents relating to Global's costs, pricing and bidding strategies would provide competitors invaluable insight into the terms Global could offer in any competitive bid and the minimum amount necessary to outbid Global. This type of advantage is fundamentally inconsistent with competitive bidding.

92. Global took reasonable measures to preserve the secrecy of the data, files and folders Darden exfiltrated and, upon information and belief, this information was not known to unauthorized third parties before Darden's wrongful conduct.

93. As set forth previously, the files Darden exfiltrated include data that would enable a competitor to incorporate Global's established methods into its technical or management

proposals without incurring the time and expense of independently developing comparable procedures.

94. Unauthorized disclosure could enable a competitor to identify operational challenges, anticipate Global's improvement priorities, adapt its own management approach, or exploit the information in competing proposals. Access to these materials would enable a competitor to incorporate Global's established methods into its technical or management proposal for the Inactive Ships recompete without incurring the time and expense of independently developing comparable procedures.

95. Global anticipates competition for the follow-on requirement for the Inactive Ship maintenance and management program. Access to the business case, labor and other costs and vendor lists would enable a competitor to replicate Global's business rationale and system integration approach, anticipate Global's fee strategy, or strengthen its proposal for that competition without incurring comparable analytical and development costs, thereby undermining Global's competitive position.

96. Darden misappropriated Global's trade secrets in an improper and unlawful manner by removing, transferring, and retaining Global's data without Global's authorization or any legitimate business purpose.

97. As a direct and proximate result of Darden's conduct, Global has suffered and, if Darden is not stopped, will continue to suffer, immediate and irreparable harm.

98. Darden's wrongful actions have also directly and proximately harmed Global's reputation and goodwill with the Navy and may permit Darden to unfairly compete against the Company using its own property, data, and information.

**COUNT V—VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT**

99. Global incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

100. As set forth more fully above, Global's trade secrets include, but are not limited to, documents concerning Global's nonpublic customer and contract information, pricing and bidding strategies, cost data, staffing plans, workforce information, recruiting sources, operational and performance methodologies, and business development information concerning existing and prospective contract opportunities.

101. Global's trade secrets are highly valuable to it. Global spends significant sums of both financial and human resources to develop, maintain, and safeguard this information, which is of great value to any competitor.

102. Global's trade secret information derives independent economic value from not being generally known to the public and not being readily ascertainable through proper means by others who could obtain economic value from the disclosure or use of the information.

103. Global has taken reasonable measures to keep such information secret and confidential, including, *inter alia,* requiring employees to agree to uphold the confidentiality of the information through contracts and company policies, incorporating a variety of managed information technology security measures into its devices and network, and utilizing physical security protocols.

104. Darden knew that he had a duty to maintain the secrecy of Global's trade secrets and not to use such information for any purpose other than for the benefit of Global.

105. Darden misappropriated Global's trade secrets in an improper and unlawful manner by removing, transferring, and retaining Global's data without Global's authorization or legitimate business purpose.

106. As a direct and proximate result of Darden's conduct, Global has suffered and, if Darden is not stopped, will continue to suffer immediate and irreparable harm.

107. Darden's wrongful actions have also directly and proximately harmed Global's reputation and goodwill with the Navy and may permit Darden to unfairly compete against the Company using its own property, data, and information.

## PRAYER FOR RELIEF

WHEREFORE, Global requests that the Court grant judgment in its favor and against Darden and order the following relief:

a. The immediate return of the Memorex device and the data, files and folders copied to that device;

b. An accounting under oath as to Darden's use of Global's confidential and trade secret information following the termination of his employment and his use of such information for the benefit of anyone other than Global during the time of his employment by Global;

c. An Order preliminarily enjoining, restraining, and requiring Darden and anyone acting in concert with him to:

1. Relinquish possession of the Memorex device to Global;

2. Refrain from accessing, connecting, modifying, deleting, copying, imaging, or otherwise altering the Memorex device or any copy of Global's information;

3. Return physical possession of all Global information and property in the form it was exfiltrated, and all copies, or permit verified deletion after forensic preservation;

4. Submit devices, accounts, and storage media reasonably likely to contain Global information to a protocol-based examination by a neutral forensic

examiner, using procedures designed to protect unrelated personal and privileged information;

d. Award possession of Global's information and other specifically identified property wrongfully detained by Darden;

e. Award compensatory damages, any statutory damages or enhanced damages authorized by law, reasonable attorneys' fees where authorized, costs, prejudgment and post-judgment interest;

f. Award punitive damages and/or enhanced damages; and

g. Such other relief as the Court deems just and proper or otherwise authorized by law.

COZEN O'CONNOR

BY: *<u>/s/ Robert W. Hayes</u>*
Robert W. Hayes, Esquire
Jeffrey I. Pasek, Esquire
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-2094
Email: rhayes@cozen.com
Email: jpasek@cozen.com
*Attorneys for Plaintiff Owl International, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **OWL INTERNATIONAL, INC.**<br>4701 S. 16th Street<br>Philadelphia, PA 19106<br><br>Plaintiff,<br><br>v.<br><br>**TRAVIS DARDEN**<br>2618 Federal Street Unit 1,<br>Philadelphia, PA 19146<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Docket No.: |

**VERIFICATION**

I, Sherri Bovino, declare as follows:

1. I am the CEO and President of Owl International, Inc. d/b/a Global a 1st Flagship Company and am authorized to execute this Verification on its behalf.

2. I have reviewed the foregoing Verified Complaint.

3. The facts set forth in the Verified Complaint are true and correct based upon my personal knowledge, company records and/or information provided to me by corporate employees

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Irvine, California on October 16 2026.

Sherri Bovino

Sherri Bovino



LEGAL\118851870\1